(No. 26309.— )

IN RE WALTER D. AMADEN, Attorney, Respondent.

*Opinion filed September 25, 1942—Rehearing denied Nov. 12, 1942.*

GUNN, MURPHY, and SMITH, JJ., specially concurring.

CHARLES LEVITAN, *amicus curiae*.

WALTER D. AMADEN, *pro se*, respondent.

Mr. JUSTICE WILSON delivered the opinion of the court:

The board of managers and the committee on grievances of the Chicago Bar Association, as commissioners of this court under rule 59, have filed a report concerning a complaint initiated by the association's committee on inquiry,

546

charging Walter D. Amaden and a lawyer referred to throughout the report, by order of the board, as "John Doe" with unprofessional conduct as attorneys and counselors at law. We are at a loss to understand on what theory the lawyer charged jointly with Amaden was given the cloak of secrecy. However, as his real name does not appear in the report we have no choice but to refer to him as John Doe. The conclusion of the commissioners to not recommend discipline against John Doe is final. *In re Casey*, 359 Ill. 496. The commissioners recommended Amaden's disbarment. He has filed exceptions to the report and the cause is submitted upon the record and proofs.

Walter D. Amaden, the respondent, was licensed to practice law in this State on October 7, 1921. For several years prior thereto, respondent had been employed as a railway postal clerk and has at all times since his admission to the bar been in the same employment. He has now been in the governmental service approximately thirty years. He has never practiced law in the accepted sense of the term, has never maintained a law office alone or with others, and has on but few occasions handled legal matters. As he well points out in his reply brief there is a distinction "between one's holding himself out as a lawyer, and one's holding himself out as a lawyer engaged in active practice for gain." In short, respondent is not a practitioner. By virtue of his employment, respondent became a member of the Railway Postal Clerk's Immediate Relief Association of Chicago. In 1938, he was a director of the association and was called upon from time to time for legal advice by H. L. Rohe, its secretary. It is entirely natural for members of an association to make legal inquiries of a member whom they know is a lawyer. It would be strange if they did not make such inquiries. Manifestly, respondent was warranted, as a director of the Immediate Relief Association, in giving legal advice to the association and its officers. He was not, however, attorney for the association. Indeed,

so far as the record discloses, the association did not retain an attorney. Advice given and services rendered from time to time by respondent were compensated by nominal sums, —so nominal, in fact, that they may properly be referred to as gratuities.

It appears that the association issued membership cerficates with the principal payable to beneficiaries on death, provided that the deceased member was in good standing and the certificate had not lapsed. George Wemple, a member, died on January 9, 1938. Irving E. Adams of Los Angeles, California, was beneficiary under a membership certificate for $1000 issued to Wemple. An assessment of two dollars then due was sent to the association three days after Wemple's death. The association resisted payment of the certificate on the ground that it had lapsed for non-payment of a premium or assessment. At the instance of Rohe, its secretary, respondent so advised Adams on January 22, 1938. Adams retained the services of Charles Beardsley, an attorney of Los Angeles, who communicated with the association, asserting that it had no defense to his client's claim. March 14, 1938, respondent informed Beardsley of the association's disinclination to refuse claims but pointed out no other choice was open in this case. On the same day, respondent wrote a letter to Rohe, enclosing a copy of his letter to Beardsley, recommending that Beardsley and Adams be allowed to take such action as they saw fit and observing that a settlement or compromise could be reached even after an action on the claim had been instituted. In April, 1938, Beardsley made an arrangement with John Doe by which the latter agreed to represent the California claimant on a twenty-five per cent contingent-fee basis, Beardsley to receive one third of the twenty-five per cent and the claimant, Adams, to receive seventy-five per cent of all the proceeds collected.

John Doe testified that during a conference with respondent on August 22 the latter agreed to see that the

claim was paid in full if the claimant would pay him $250. On August 24, John Doe wrote to Beardsley, in part, as follows:

"He (Amaden) bluntly put the situation as follows—If a settlement is made I will receive a small fee and since I think I can win the case and whether I do win or not I will receive a fee of at least $300.00 I am opposed to settlement. In any event you will receive nothing for several years. I think I can get you the full amount of the claim if $250.00 is paid me. I realize it does not look ethical but I must consider myself.

"My thoughts regarding this statement are—The case is a toss-up. If the court rules the Asso. is a mutual benefit asso. we will win but if the ruling is otherwise I do not believe recovery will be granted. A settlement of $750.00, even $500.00 merits serious consideration by you and your client. I understand Mr. Amaden's position but I feel I cannot take part in paying him. If Mr. Amaden is willing to take the word of Mr. I. E. Adams that $250.00 will be sent him it is all right with me. Your fee and mine would of course be based on a settlement of $750.00."

August 26, Rohe wrote to John Doe in reply to a request for a reconsideration, and payment in full, of the claim, stating that "Personally, I am willing to let the courts decide." August 31, Beardsley instructed John Doe to accept a settlement of $750, adding, "Mr. Edward Adams and I would not have any part in the payment to Mr. Amaden, and nothing of that kind could be done with our knowledge or cooperation. Our client is willing to receive the $750.00, and I think it is up to Amaden to make his own arrangement for his fee, and I suggest that you try to get a bona fide settlement in the amount indicated."

Respondent strenuously denies John Doe's narration of their conference and insists that at no time did he ever make a proposition as related by John Doe. Secretary Rohe died in the late summer or early fall of 1938 and was succeeded by a director, J. P. Walker. Respondent was an unsuccessful candidate for the position of secretary. It may be observed that the election to fill the vacancy took place when he was out of the city in the performance of his duties as a railway mail clerk. It also appears that neither W. G. Nicholson, chairman of the board of directors, nor

Walker, the present secretary, was on particularly friendly terms with respondent.

September 28, 1938, the claim was approved in the full amount ($1,000) at a meeting of the directors. Respondent was not present at this meeting. Nicholson and Walker testified that neither respondent nor anyone else urged them to approve the allowance of the claim in full. On the same day, it not appearing whether with or without knowledge of the action of the board of directors, John Doe, in a letter to Beardsley, said: "It may be possible to eliminate some of our difficulties by having Mr. Adams assign the claim to a stranger in Chicago upon the payment of $750.00." September 30, Beardsley informed John Doe it was agreeable with him to have an arrangement made with respondent, or the directors, for an assignment of I. E. Adams's claim to someone in Chicago for a cash payment of $750. John Doe prepared an assignment, forwarded it to Beardsley, requesting that the claimant execute it. This was done, and the assignment was returned to John Doe to use in consummating the settlement. On October 10 and 11, Beardsley, who was present in Chicago on other matters, accompanied John Doe to the offices of the Immediate Relief Association for the purpose of completing the transaction. Respondent was not present, and, according to John Doe, none of the officers was available. From his testimony it appears, however, that either Nicholson or Walker was present as he says one of them informed him respondent was absent from the city and would not return until October 13. No good reason appears for the failure of the attorneys to insist upon completion of the settlement at this time when they undoubtedly would have received the allowance voted by the directors. In any event, Beardsley and John Doe did not make any real effort to close the case, and Beardsley returned to California.

On October 13, John Doe delivered the assignment at the offices of the association. According to a custom of the association, Nicholson, Walker and respondent, consti-

tuting a claims committee consisting of three members of the board, participated in the negotiations attending the settlement. In the course of the negotiations, respondent inserted his own name in the blank form as assignee. Respondent stated that he did not observe the amount specified as consideration, insisting it was immaterial whether the assignment recited $1 and other good and valuable consideration, or $750, the legal effect being in each case the same. A check for $1,000 on the Continental Illinois National Bank and Trust Company of Chicago was drawn by Walker, as secretary-treasurer, payable to the order of cash. Walker did not deliver the check to John Doe. An adequate reason suggested for making the check payable to cash is that John Doe did not maintain a checking account and it would facilitate matters for him to receive the payment in currency, rendering it possible for him to immediately purchase a bank draft to send to Beardsley. The back of the check bears this indorsement: "J. P. Walker, Sec. Treas. In full settlement of claim of Irving E. Adams beneficiary of G. S. Wemple." Before repairing to the drawee bank, John Doe signed a receipt for $1,000 reciting in part that it covered "all fees of every nature, and this arrangement is made in order that local fees, costs, etc., may be paid before remittance is made to Irving E. Adams, beneficiary, and it is agreed that no suit or other action will be instituted in the future, this amount being a settlement in full to cover all fees as well as the claim of the beneficiary." John Doe testified that respondent said "Here is a receipt" and maintains he signed it with reluctance at the insistence of respondent, fearing that the settlement might not be effected unless he did so. John Doe also says he did not see the receipt which respondent drafted at the offices of the association until the money was paid to him at the bank. Nicholson testified that John Doe signed the receipt at the association's offices. Walker cashed the check at the bank and turned the entire amount over to John Doe. It is conceded that respondent was not present at the bank

when the check was cashed. John Doe obtained a draft for $625 and forwarded it to Beardsley. John Doe's own fee was $125 on the basis of a settlement of $750. He testified that by prearrangement he met respondent shortly afterwards and gave him $250 in currency. John Doe's testimony as to the place he turned the money over to respondent does not harmonize. At one time he stated that he paid the money to respondent at a corner of the bank at the intersection of Clark street and Jackson boulevard. Again, he testified that he delivered the money to respondent at the Brevoort Hotel several blocks distant from the bank. He testified that he was indignant about the transaction. Nevertheless, it appears that he was not unduly disturbed as he testified he and respondent proceeded to the hotel for a very late lunch where he turned the money over to the latter. Respondent denies that he met John Doe, as recounted, and that he received $250 or any other sum of money from him in connection with the transaction, asserting that John Doe converted this sum to his own use. Several months later, the board of directors of the association voted to pay respondent fifteen dollars for his services in the Adams-Wemple case, and this amount was paid to him in May, 1939. Respondent testified that he received no other consideration for his services incident to this claim.

Our attention is directed to the fact that $200 in currency was deposited in respondent's checking account in a suburban bank on October 14, 1938. From the testimony of Jessie Dean Dickson, a sister of respondent's wife, it appears that she gave her sister $150 in currency during the first week of October because of her need for the money. Respondent's wife testified that her sister had aided her financially on previous occasions and each fall advanced substantial sums to assist with the education of her sons. From the deposit slip made out by respondent's wife, it appears that the currency was noted, as follows: "J—$150," B—$6, C—$44." Respondent's wife explained the first item, "J—$150," as referring to the $150 given her by her

sister, Jessie, the second item, "B—$6," as $6 turned over to her by her son Bob, and the third item of "C—$44," as currency which she herself had saved.

The question is presented as to whether the foregoing facts warrant respondent's disbarment. In order for a recommendation of disbarment to stand there must be not only a charge of moral turpitude but also proof of the charge made. The proof, we have consistently announced, must be of a convincing character. Suspicious circumstances do not suffice. The proof must be clear and convincing. We are impelled to conclude that the proof in the present proceeding does not satisfy our oft-stated requirements. The claimant, Adams, received all that he was entitled to receive under the settlement approved by his local attorney and by his attorney in Chicago. John Doe and the Los Angeles attorney have each received the entire amount of the fees to which they were entitled by their contract of retainer with their client. It may be that the client has a claim against John Doe, but the question is not before us. The board of directors of the Immediate Relief Association, in the exercise of its discretion, voted to make full settlement of the claim for $1,000. This amount the officers of the association turned over to John Doe. We fail to find any complaint by the association as to the disposition of this sum by John Doe or any complaint that respondent received any portion of this money. Respondent's dereliction, if any, is in the alleged receipt of $250 out of the proceeds of the settlement. We perceive no valid reason for John Doe's agreement to turn the money over to respondent or the alleged delivery of the $250 to him. The only testimony in the record tending to support John Doe's uncorroborated assertions is his own testimony. We have previously pointed out that the conclusion of our commissioners absolving John Doe is final. It does not follow that his absolution demanded the recommendation of professional death to respondent. If the respondent did receive $250 out of the settlement, as John Doe asserts,

John Doe was an accomplice or co-conspirator. We thus have the diametrically opposing testimony of these two attorneys on this single material issue. John Doe, at the time of the transaction, had been actively practicing law in Chicago for nine years. Respondent had been a member of the bar for seventeen years but was not engaged in the active practice. The record neither warrants the complete acceptance of John Doe's testimony nor the rejection *in toto* of the testimony adduced by respondent. The latter's denial of John Doe's account of the transaction, supported by reputable witnesses, and his explanation of the deposit of $200 in currency at his bank on October 14, 1938, are not incredible. The hearings developed into an indecorous contest between John Doe and respondent, each endeavoring to prove the other guilty of a serious charge and himself blameless. The conduct of the transaction in question may well be criticized not only for the manner in which it was handled by respondent, but also for the manner in which it was conducted by John Doe. We deem it sufficient to conclude that when all the facts and circumstances are considered, the proof is not of the convincing character essential to a finding that respondent is no longer worthy of membership on the roll of attorneys of this court. The commissioners, on the record made, have recommended the severest disciplinary action solely on the uncorroborated testimony of an admitted accomplice. This proof we do not regard as satisfactory. Without substantial and convincing testimony indicating that respondent's conduct exhibits moral turpitude, we cannot concur in the recommendation of his disbarment.

The report of the commissioners is denied, and the rule discharged.

*Rule discharged.*

GUNN, MURPHY, and SMITH, JJ., specially concurring:

We agree with the conclusion reached in the foregoing opinion and all that is said in reference to the insufficiency of the evidence to support the recommendation that re-

spondent be disbarred, but we are opposed to the adoption and publication of an opinion that extends the cloak of secrecy as to the identity of the person named in the opinion as John Doe. The conclusion reached depends in a great measure upon the credit to be attached to the evidence of the respondent and the witness John Doe. Under such circumstances the real identity of the witness should have been shown in the report.